UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | No. 1:25-cr- 57-SE-TSM-01 |
| | ) | |
| **ROBYNNE ALEXANDER** | ) | |

## PLEA AGREEMENT

Pursuant to Rules 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United States of America by its attorney, John J. McCormack, Acting United States Attorney for the District of New Hampshire, and the defendant, Robynne Alexander, and the defendant's attorney, Jeff Levin, Esquire, enter into the following Plea Agreement:

1. <u>The Plea and the Offense</u>.

The defendant agrees to waive her right to have this matter presented to a grand jury and plead guilty to an Information charging her with wire fraud, in violation of 18 U.S.C. § 1343.

In exchange for the defendant's guilty plea, the United States agrees to the sentencing stipulations identified in Section 6 of this agreement.

2. <u>The Statute and Elements of the Offense</u>.

Title 18, United States Code, Section 1343 provides, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of [interstate or international] wire . . . shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

The defendant understands that the offense has the following elements, each of which the

- 1 -

United States would be required to prove beyond a reasonable doubt at trial:

<u>First</u>, that there was a scheme, substantially as charged in the Information, to obtain money or property by means of false or fraudulent pretenses;

<u>Second</u>, that the scheme to obtain money or property by means of false or fraudulent pretenses involved a false statement, assertion, half-truth or knowing concealment concerning a material fact or matter;

<u>Third</u>, that the defendant knowingly and willfully participated in this scheme with the intent to defraud; and

<u>Fourth</u>, that for the purpose of executing the scheme or in furtherance of the scheme, the defendant caused an interstate or foreign wire communication to be used, or it was reasonably foreseeable that for the purpose of executing the scheme or in furtherance of the scheme, an interstate or foreign wire communication would be used, on or about the date alleged.

*Pattern Criminal Jury Instructions for the District Courts of the First Circuit, District of Maine Internet Site Edition, 2017 Revisions,* Instruction 4.18.1343, https://www.med.uscourts.gov/sites/med/files/crpjilinks.pdf.

    3. <u>Offense Conduct</u>.

The defendant stipulates and agrees that if this case proceeded to trial, the government would introduce evidence of the following facts, which would prove the elements of the offense beyond a reasonable doubt:

<u>Raxx-LeMay</u>

In 2018, the defendant was a real estate investment coach associated with a company where she was paid to provide education on real estate investing principles, personalized mentorship and advice, and connections in the real estate investing industry. At that time, the defendant began accepting investments for her first real estate investment project in New England called Raxx-LeMay, LLC (Raxx-LeMay). The purpose of this project was purportedly to acquire, operate, renovate, and eventually sell two commercial buildings located at 1211 &

1217 Elm Street in Manchester, New Hampshire. Between 2018 and 2021, the defendant raised approximately $2 million from 18 investors by issuing membership interests in Raxx-LeMay. Many of these investors first met the defendant as their real estate investment coach.

As part of the investment project, the defendant provided investors with an Investment Summary, Private Placement Memorandum, and Operating Agreement setting forth the details and terms of the investments. Among the terms was a requirement for a Minimum Dollar Amount of $2 million to be raised by May 15, 2018, or at such time as the Property is no longer under contract, whichever comes later. If the minimum dollar amount was not raised by that date, investors were to get their money back with interest. By the terms of the offering, the defendant was not permitted to access investor funds unless and until the Minimum Dollar Amount was reached.

On or about July 27, 2018, Raxx-Lemay purchased the property at 1211-1217 Elm Street. By the date of the sale, the defendant had only raised $700,000 in investor funds, well short of the required $2 million Minimum Dollar Amount. In order to purchase the property, the defendant borrowed funds from a "hard money lender" in exchange for a mortgage on the property. A hard money lender is an individual or company, rather than a bank or conventional lender, that makes loans secured by real property, generally short-term bridge loans, primarily in real estate transactions. Hard money loans generally have higher interest rates than more traditional financing options. Despite not having raised the required Minimum Dollar Amount, the defendant did not return investor money with interest, but instead proceeded to use investor money for purposes that were not permissible under the offering terms.

Between July 2018 and November 2018, the defendant used Raxx-LeMay investor funds

as collateral to draw $1.3 million from a line of credit in the name of another entity that she owned and controlled. In September and October 2018, the defendant used a portion of that line of credit to pay back at least four investors in projects other than Raxx-LeMay totaling $282,000. The defendant later used Raxx-LeMay investor funds to repay the line of credit. In July 2021, the defendant also used Raxx-LeMay investor funds to make payments to two Raxx-LeMay investors totaling approximately $435,000. The defendant also used investor funds to pay lenders and costs related to other real estate investment projects and to make loan to herself or other entities she controlled totaling at least $110,000.

In July 2021, the defendant received $600,000 from a company controlled by two Raxx-LeMay investors in exchange for 25% ownership in Raxx-LeMay. The company was also to perform the general contracting services for the Raxx-LeMay project. The two investors soon learned that the defendant had failed to keep ordinary business records, was struggling to keep up with payments to Raxx-LeMay's hard money lender, and that the defendant would not be able to finance the renovation of the Raxx-LeMay buildings.

This led the company controlled by the two investors to take control of the Raxx-LeMay project. The defendant agreed to give the two investors an 81% interest in an entity called Signature on Elm, LLC, created by the defendant in July 2021, with the defendant retaining a 19% interest for herself. The defendant then transferred the real estate that Raxx-LeMay owned to Signature on Elm in February 2022.

By the terms of the Operating Agreement, the sale of the Raxx-LeMay real estate required an affirmative vote of the majority of the investors. The defendant did not obtain approval from the investors and in fact did not even inform the investors that she was

transferring the real estate to Signature on Elm. As a result of the transfer, Raxx-LeMay, which did not have any interest in Signature on Elm, had no real estate holdings, a fact that was concealed from the other Raxx-LeMay investors whose investments then became worthless. Of the 18 investors in Raxx-LeMay, only four received their investment back, leaving Raxx-LeMay investors with approximately $850,000 in losses caused by the defendant.

Elm and Baker

In late 2019, the defendant began soliciting investments for a new real estate project to purchase and renovate a property at 4 Elm Street in Manchester. The defendant formed the entity Four on Elm, LLC and purchased the property through that entity after receiving $260,000 from two investors. Approximately one year later, the defendant formed a second entity, Elm and Baker, LLC, to accept additional investments related to the 4 Elm Street property.

On or about May 27, 2021, Victim 1 wired $750,000 to a bank account held at Bar Harbor Bank & Trust in the name of Elm and Baker, LLC in order to invest in the defendant's real estate project. The operating agreement with Victim 1 stated that the sole purpose of Elm and Baker, LLC would be to develop the property into "an adaptive reuse conversion to apartments to be sold on the market," with Victim 1 receiving her investment principal and 25% of the net sale profits after the sale of the property. The defendant instead used approximately $327,000 of Victim 1's investment to repay the two original investors of Four on Elm, approximately $170,000 to repay an unrelated former investor, approximately $45,000 to make a personal loan to an individual unrelated to the project, and approximately $25,000 to make loan payments on a different project unrelated to Elm and Baker. The defendant eventually stopped making mortgage payments on the 4 Elm Street property and was foreclosed on in the spring of

2023. Victim 1 did not learn of the foreclosure sale for nearly a year.

Legacy at Laconia

In November 2022, the defendant, on behalf of Legacy at Laconia, LLC ("Legacy at Laconia), signed an agreement to purchase from the State of New Hampshire a 217-acre property in Laconia, New Hampshire. The Legacy at Laconia project was described on its website as a project to "create a first in the world, innovative, world class resort implementing universal design with barrier free accessibility with an all-in-one sustainable village."

The defendant offered ownership interests through a separate entity called Legacy at Laconia Fund LLC, seeking $40 million. In exchange for investments, investors would receive equity positions in Legacy at Laconia Fund LLC. The defendant did not receive any investments in Legacy at Laconia Fund LLC. She did, however, receive one investment of $250,000 in Legacy at Laconia LLC—the entity that signed the purchase agreement—on October 11, 2023, from Victim 2. The investment was secured by a promissory note payable with interest at a rate of 15% by February 15, 2024. Despite Victim 2's funds being invested for Legacy at Laconia, the defendant misappropriated at least $75,000 for payments related to other real estate investment projects, personal living expenses, and nearly $5,000 of personal travel expenses in Paris, Barcelona, Valencia, Nassau, Florida, and New Orleans in October and November 2023. The defendant was unable to secure financing to close the purchase of the Laconia property and the State of New Hampshire terminated the sale agreement on April 21, 2024. Victim 2 did not receive any repayment of the investment.

In addition to these three investment projects, the defendant's scheme included several other real estate investment projects for which she solicited investments including projects at 9 G

Street in Hampton, New Hampshire (HB9G), 9 Cross Street in Somerville, Massachusetts, 23 Country Club Road in Manchester, New Hampshire, 37 C Street in Manchester, New Hampshire, and a group of apartment units in Providence, Rhode Island (the Providence Portfolio). In total, the defendant's scheme involved at least eight investment projects resulting in losses to at least 24 victims of approximately $3,023,000.

4. <u>Penalties, Special Assessment and Restitution</u>.

The defendant understands that the penalties for the offense are:

A.   A maximum prison term of 20 years (18 U.S.C. § 1343);

B.   A maximum fine of $250,000 or twice the gross gain or loss, whichever is greater (18 U.S.C. § 3571(b)(3) or (d));

C.   A term of supervised release of not more than 3 years (18 U.S.C. § 3583(b)(2). The defendant understands that the defendant's failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring the defendant to serve in prison all or part of the term of supervised release, with no credit for time already spent on supervised release;

D.   A mandatory special assessment of $100 at or before the time of sentencing (18 U.S.C. § 3013(a)(2)(A)); and

E.   To facilitate the payment and collection of any restitution that may be ordered, the defendant agrees that, upon request, she will provide the United States with a financial disclosure statement and supporting financial documentation.

The defendant further agrees that, if restitution is ordered, it shall be due and payable immediately after the judgment is entered and is subject to immediate enforcement, in full, by the United States. If the Court imposes a schedule of payments, the defendant agrees that the schedule of payments is a schedule of the minimum payment due, and that the payment schedule does not prohibit or limit the methods by which the United States may immediately enforce the judgment in full, including, but not limited to, the Treasury Offset Program.

5. <u>Sentencing and Application of the Sentencing Guidelines</u>.

The defendant understands that the Sentencing Reform Act of 1984 applies in this case

- 7 -

and that the Court is required to consider the United States Sentencing Guidelines as advisory guidelines. The defendant further understands that she has no right to withdraw from this Plea Agreement if the applicable advisory guideline range or her sentence is other than she anticipated.

The defendant also understands that the United States and the United States Probation Office shall:

    A.    Advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

    B.    Respond to questions from the Court;

    C.    Correct any inaccuracies in the pre-sentence report;

    D.    Respond to any statements made by her or her counsel to a probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant acknowledges that any estimate of the probable sentence or the probable sentencing range under the advisory Sentencing Guidelines that she may have received from any source is only a prediction and not a promise as to the actual sentencing range under the advisory Sentencing Guidelines that the Court will adopt.

6. <u>Sentencing Stipulations and Agreements</u>.

Pursuant to Fed. R. Crim. 11(c)(1)(B), the United States and the defendant stipulate and agree to the following:

    (a)    The United States will recommend a downward variance that is the equivalent of two offense levels below the applicable total offense level determined by the Court, and will recommend that the defendant be sentenced to the low end of the guidelines sentencing range associated

with that variant offense level; and

    (b)    The defendant is liable for at least $3,023,000 in restitution.

The defendant understands that the Court is not bound by the foregoing agreements and, with the aid of a pre-sentence report, the court will determine the facts relevant to sentencing. The defendant also understands that if the Court does not accept any or all of those agreements, such rejection by the Court will not be a basis for the defendant to withdraw her guilty plea.

The defendant understands and agrees that the United States may argue that other sentencing enhancements should be applied in determining the advisory guideline range in this case, and she is permitted to object to them.

The United States and the defendant are free to make recommendations with respect to the terms of imprisonment, fines, conditions of probation or supervised release, and any other penalties, requirements, and conditions of sentencing as each party may deem lawful and appropriate, unless such recommendations are inconsistent with the terms of this Plea Agreement.

7. <u>Acceptance of Responsibility</u>.

The United States agrees that it will not oppose an appropriate reduction in the defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the offense. The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

    A.    Fails to admit a complete factual basis for the plea at the time she is sentenced or at any other time;

    B.    Challenges the United States' offer of proof at any time after the plea is

        entered;

C.     Denies involvement in the offense;

D.     Gives conflicting statements about that involvement or is untruthful with the Court, the United States or the Probation Office;

E.     Fails to give complete and accurate information about her financial status to the Probation Office;

F.     Obstructs or attempts to obstruct justice, prior to sentencing;

G.     Has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

H.     Fails to appear in court as required;

I.     After signing this Plea Agreement, engages in additional criminal conduct; or

J.     Attempts to withdraw her guilty plea.

The defendant understands and agrees that she may not withdraw her guilty plea if, for any of the reasons listed above, the United States does not recommend that she receive a reduction in her sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is not required to reduce the offense level if it finds that she has not accepted responsibility.

If the defendant's offense level is sixteen or greater, and she has assisted the United States in the investigation or prosecution of her own misconduct by timely notifying the United States of her intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the United States will move, at or before sentencing, to decrease the defendant's base

offense level by an additional one level pursuant to U.S.S.G. § 3E1.1(b).

    8. <u>Waiver of Trial Rights and Consequences of Plea</u>.

The defendant understands that she has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent her. The defendant also understands that she has the right:

    A.    To plead not guilty or to maintain that plea if it has already been made;

    B.    To be tried by a jury and, at that trial, to the assistance of counsel;

    C.    To confront and cross-examine witnesses;

    D.    Not to be compelled to provide testimony that may incriminate her; and

    E.    To compulsory process for the attendance of witnesses to testify in her defense.

The defendant understands and agrees that by pleading guilty she waives and gives up the foregoing rights and that upon the Court's acceptance of her guilty plea, she will not be entitled to a trial.

The defendant understands that if she pleads guilty, the Court may ask her questions about the offense, and if she answers those questions falsely under oath, on the record, and in the presence of counsel, her answers will be used against her in a prosecution for perjury or making false statements.

    9. <u>Acknowledgment of Guilt; Voluntariness of Plea</u>.

The defendant understands and acknowledges that she:

    A.    Is entering into this Plea Agreement and is pleading guilty freely and voluntarily because she is guilty;

    B.    Is entering into this Plea Agreement without reliance upon any promise or benefit of any kind except as set forth in this Plea Agreement or revealed to the Court;

- 11 -

    C.    Is entering into this Plea Agreement without threats, force, intimidation, or coercion;

    D.    Understands the nature of the offense to which she is pleading guilty, including the penalties provided by law; and

    E.    Is completely satisfied with the representation and advice received from her undersigned attorney.

10. <u>Scope of Agreement</u>.

The defendant acknowledges and understands that this Plea Agreement binds only the undersigned parties and cannot bind any other non-party federal, state or local authority. The defendant also acknowledges that no representations have been made to her about any civil or administrative consequences that may result from her guilty plea. The defendant further acknowledges that this Plea Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

11. <u>Collateral Consequences</u>.

The defendant understands that as a consequence of her guilty plea she will be adjudicated guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

The defendant understands that, if she is not a citizen of the United States, her guilty plea to the charged offense will likely result in her being subject to immigration proceedings and removed from the United States by making her deportable, excludable, or inadmissible. The defendant also understands that if she is a naturalized citizen, her guilty plea may result in ending her naturalization, which would likely subject her to immigration proceedings and possible removal from the United States. The defendant understands that the immigration consequences of this plea will be imposed in a separate proceeding before the immigration authorities. The

defendant wants and agrees to plead guilty to the charged offense regardless of any immigration consequences of this plea, even if this plea will cause her removal from the United States. The defendant understands that she is bound by her guilty plea regardless of any immigration consequences of the plea. Accordingly, the defendant waives any and all challenges to her guilty plea and to her sentence based on any immigration consequences and agrees not to seek to withdraw her guilty plea, or to file a direct appeal or any kind of collateral attack challenging her guilty plea, conviction, or sentence, based on any immigration consequences of her guilty plea.

12. <u>Satisfaction of Federal Criminal Liability; Breach</u>.

The defendant's guilty plea, if accepted by the Court, will satisfy her federal criminal liability in the District of New Hampshire arising from her participation in the conduct that forms the basis of the [indictment] [information] in this case. JSL

The defendant understands and agrees that, if after entering this Agreement, she fails specifically to perform or fulfill completely each one of her obligations under this Agreement, fails to appear for sentencing, or engages in any criminal activity prior to sentencing, she will have breached this Agreement.

If the United States, in its sole discretion, and acting in good faith, determines that the defendant committed or attempted to commit any further crimes, failed to appear for sentencing, or has otherwise violated any provision of this Agreement, the United States will be released from its obligations under this Agreement, including, but not limited to, any agreement it made to dismiss charges, forbear prosecution of other crimes, or recommend a specific sentence or a sentence within a specified range. The defendant also understands that she may not use her breach of this Agreement as a reason to withdraw her guilty plea or as a basis to be released from

her guilty plea.

    13.  <u>Waivers</u>.

    A.  Appeal.

The defendant understands that she has the right to challenge her guilty plea and/or sentence on direct appeal. By entering into this Plea Agreement the defendant knowingly and voluntarily waives her right to challenge on direct appeal:

1. Her guilty plea and any other aspect of her conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s), other adverse dispositions of pretrial motions or issues, or claims challenging the constitutionality of the statute of conviction; and

2. The sentence imposed by the Court if it is within, or lower than, the guideline range determined by the Court, or if it is imposed pursuant to a minimum mandatory sentence.

The defendant's waiver of her rights does not operate to waive an appeal based upon new legal principles enunciated in Supreme Court or First Circuit case law after the date of this Plea Agreement that have retroactive effect; or on the ground of ineffective assistance of counsel.

    B.  Collateral Review

The defendant understands that she may have the right to challenge her guilty plea and/or sentence on collateral review, e.g., a motion pursuant to 28 U.S.C. §§ 2241 or 2255. By entering into this Plea Agreement, the defendant knowingly and voluntarily waives her right to collaterally challenge:

1. Her guilty plea, except as provided below, and any other aspect of her conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s), other adverse dispositions of pretrial motions or issues, or claims challenging the constitutionality of the statute of conviction; and

2. The sentence imposed by the Court if it is within, or lower than, the

- 14 -

guideline range determined by the Court, or if it is imposed pursuant to a minimum mandatory sentence.

The defendant's waiver of her right to collateral review does not operate to waive a collateral challenge to her guilty plea on the ground that it was involuntary or unknowing, or on the ground of ineffective assistance of counsel. The defendant's waiver of her right to collateral review also does not operate to waive a collateral challenge based on new legal principles enunciated by in Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

C. Freedom of Information and Privacy Acts

The defendant hereby waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of the case(s) underlying this Plea Agreement, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

D. Appeal by the Government

Nothing in this Plea Agreement shall operate to waive the rights or obligations of the Government pursuant 18 U.S.C. § 3742(b) to pursue an appeal as authorized by law.

14. No Other Promises.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

15. Final Binding Agreement.

None of the terms of this Plea Agreement shall be binding on the United States until this

Plea Agreement is signed by the defendant and the defendant's attorney and until it is signed by the United States Attorney for the District of New Hampshire, or an Assistant United States Attorney.

16. Agreement Provisions Not Severable.

The United States and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

JOHN J. MCCORMACK
Acting United States Attorney

Date: 6/25/25

By: _____
John J. Kennedy
Assistant United States Attorney
NH Bar Association #19557
53 Pleasant St., 4th Floor
Concord, NH 03301
john.kennedy2@usdoj.gov

The defendant, Robynne Alexander, certifies that she has read this 16-page Plea Agreement and that she fully understands and accepts its terms.

Date: 6.25.2025

_____
Robynne Alexander, Defendant

I have read and explained this 16-page Plea Agreement to the defendant, and she has advised me that she understands and accepts its terms.

Date: 6/25/2025

_____
Jeff Levin, Esquire
Attorney for Robynne Alexander

- 16 -